**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

2025 IL App (3d) 240461-U

Order filed October 1, 2025

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2025

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court |
| | ) | of the 12th Judicial Circuit, |
| Plaintiff-Appellee, | ) | Will County, Illinois. |
| | ) | |
| v. | ) | Appeal No. 3-24-0461 |
| | ) | Circuit No. 19-CF-286 |
| MARIO CHAVEZ, JR, | ) | |
| | ) | The Honorable |
| Defendant-Appellant. | ) | Daniel Rippy, |
| | ) | Judge, presiding. |

_____

JUSTICE ANDERSON delivered the judgment of the court.
Justices Holdridge and Davenport concurred in the judgment.

_____

**ORDER**

¶ 1     *Held*: The trial court did not err in failing to enter a directed verdict or a judgment notwithstanding the verdict in Defendant's favor, and in denying Defendant's motion for a new trial. The probation fees are modified to $25 per month.

¶ 2     Defendant was found guilty by a jury on three of four charged counts of aggravated criminal sexual abuse for physical contact with a minor, S.M. 720 ILCS 5/11-1.60(d), (g) (West 2016). Each count was charged as a Class 2 felony. The conduct was considered aggravated because Defendant was alleged to have been more than five years older than the victim. Defendant filed motions for directed verdict, judgment notwithstanding the verdict (JNOV), motions to

reconsider, and a motion for a new trial. These motions were mainly based on the notion that the State failed to prove a five-year age difference and that the evidence was insufficient to convict. The trial court denied each of those motions. Defendant filed a timely appeal. We affirm those trial court orders.

¶ 3                                    I. BACKGROUND

¶ 4        In December 2017, Defendant, Mario Chavez, Jr., lived with his then-girlfriend, Paige Mayfield, and their two-month old son at Chavez's father's house in Joliet, Illinois. Paige's younger sister, S.M., asked to spend some time at the house at the start of her high school winter break. S.M. was 14 at that time. After spending two nights with Paige and Defendant, Paige and S.M. went to the home of their mother, Christy Mayfield (n/k/a Papp). While at their mother's house, Paige inadvertently saw something on S.M.'s cell phone that alerted her that S.M. may have had flirtatious feelings for her sister's boyfriend. Because they had another sister, Paige asked about the statement. S.M. then told Christy that she had been sexually assaulted by Defendant. Paige suggested that S.M. go to the hospital for an examination. S.M. agreed, and Paige took her to the hospital, where she was examined.

¶ 5        During the examination, S.M. was tested for the presence of male DNA. Her assault allegations were also reported to police. Later, S.M. was interviewed by a specially trained interviewer. The police detective assigned to the case received a transcript of that interview and interviewed other possible witnesses, including Defendant. The detective examined S.M.'s cell phone but found no communication between her and Defendant. In February 2019, the Will County State's Attorney indicted Defendant on four counts of aggravated criminal sexual abuse for having sexual contact with a minor while being more than five years older than the victim. 720 ILCS 5/11-1.60(d), (g) (West 2016).

¶ 6    Trial began on September 26, 2023. The State's first witness was Christy Mayfield Papp, the mother of Paige and S.M. She testified without objection that she first came to know Defendant perhaps 15 years earlier, when he was dating Christy's cousin, Valerie. Both Defendant and Valerie were teenagers at the time. Some years later, Defendant began dating Christy's daughter Paige while Paige was still in high school. Christy never testified to Defendant's exact age. She stated that, before the incident with S.M., she liked Defendant and thought he was a great dad. She thought he was going to be good for Paige, but she reported that her whole family had been ruined after the incidents with S.M.

¶ 7    S.M. was the next witness. She testified that she went to the house where Paige and Defendant lived at the start of her school's winter break. They all played video and board games, mostly while lying on the bed in Paige's bedroom. She testified that at one point Defendant laid next to her while Paige was out of the room taking a bath, pulled down her pants, and inserted his penis into her vagina. She also recounted a later time when Defendant came up behind her while she was fixing her hair in the bathroom, pulled his pants down, pulled her pants down, and inserted his penis into her vagina. She testified that she asked him to stop but did not scream for help or try to wrestle away. On another afternoon, S.M. stated that Defendant entered the bedroom in which she was staying and pulled her hand onto his bare penis. During her testimony, S.M. had difficulty remembering when certain events occurred and also when, or if, Defendant was ever out of the house for work, and who else may have been present during the two days she was at the house.

¶ 8    When the State asked S.M., "And approximately how old was Mario?", she simply responded, "24." The trial court overruled a hearsay objection without argument or a response from the State. S.M. was also asked Paige's age, and she replied, "I believe 19." On the State's redirect examination, S.M. was asked, "He was 24, correct?", and she responded, "Correct."

3

Defense counsel then renewed his hearsay objection, which the judge again overruled without a response from the State.

¶ 9 The State's third witness was Detective Patrick Schumacher, the case investigator and a 24-year veteran of the Joliet Police Department. He testified that on January 2, 2018, he reviewed reports from S.M.'s interview with a specially trained examiner at the Joliet Children's Advocacy Center. He later conducted other investigative activities. At trial, he was asked, "During your investigation, did you learn the age of the Defendant?" and responded, "Yes." He was then asked, "And what was the age of the Defendant at the time of January 2, 2018?" At that point, defense counsel raised a hearsay objection and requested a sidebar off the record. The judge did not rule on the objection or make a statement on the record regarding the sidebar at that time.

¶ 10 During questioning, the detective explained that his investigation included reviewing the report from S.M.'s initial interview at the hospital and speaking with other individuals and potential witnesses, including Defendant. When asked if he had learned Defendant's age in January 2018, he responded affirmatively. He was then asked how old Defendant was at that time and responded, "He was 25 years of age." No objection to age-related questions was raised after the sidebar with the judge, and no age-related questions were asked during cross-examination. In his posttrial motion argument, defense counsel explained that he made no additional objections because the trial court had advised the attorneys of his position on that line of questioning.

¶ 11 Next, the trial court read the jury the parties' stipulation about the testimony of two other witnesses addressing the procedures and safeguards used to prevent contamination of the DNA swabs taken from S.M. at the hospital. The court then discharged the jury for the day and elected to put on the record what happened during the sidebar. The trial court explained, "The defense objected to the detective stating the age of the Defendant as hearsay and as a discovery violation.

4

That was overruled." The court then asked both counsel whether that was their recollection of the events, and both responded affirmatively.

¶ 12    The State's last witness was a forensic biology and DNA analyst for the Illinois State Police. She explained the process for testing swabs containing bodily fluids to determine the presence of DNA and for comparing the results to include or exclude an individual as a possible donor. Two of the four swabs obtained had so little sample material that they were combined for testing purposes. One of the swabs had no test material at all. Although the vaginal swabs contained male DNA, no sperm cells were detected. The male skin cells on at least one of the four swabs were sufficiently similar to those collected from Defendant to identify him as a potential donor. After presenting that forensic testimony, the State rested.

¶ 13    Defendant then made an oral motion for a directed verdict. Defense counsel argued that the only proof that Defendant was more than five years older than the victim was hearsay, making the question inappropriate to be given to the jury. Counsel cited no supporting case law. He also argued that S.M.'s faulty memory provided insufficient details about the alleged contacts to establish guilt. He noted that only one incident had a firm time attached to it, and he vaguely cited *Neil v. Biggers*, 93 S. Ct. 375 (1972), without discussion, for the proposition that more details are needed to obtain a conviction for an offense such as rape. Lastly, counsel cited the forensic evidence analyst's testimony that the test swabs could have been contaminated during collection or storage such that only one of four showed Defendant to be a possible donor. Without asking for the State's response, the trial court denied Defendant's motion, ruling that the evidence was sufficient to go to the jury.

¶ 14    At that point, the defense called Paige Mayfield, who by then was Defendant's wife and went by Paige Mayfield Chavez, to testify. She testified that she picked up S.M. to come over to the house she shared with Defendant on December 21, 2017. After Defendant arrived home from

5

work on the first day of S.M.'s visit, he was continuously in Paige's presence until they went to bed, with S.M. in another room. Paige denied ever taking a bath while S.M. was in the house. The next morning, Defendant left for work and returned home about 6 p.m., again being continuously in Paige's presence until they went to sleep. Because Paige was always with Defendant, she concluded that he could not have had sexual contact with S.M. without her knowledge. She also testified that Defendant left early for work on the morning of December 23 before she and S.M. went to their mother's house, where S.M. first mentioned the sexual contact with Defendant. After that discovery, Paige took S.M. to the hospital for an evaluation. On cross-examination, the State asked Paige, without objection, Defendant's date of birth, and she responded that it was January 13, 1992. The defense then rested.

¶ 15 During closing arguments, both sides discussed the forensic examiner's testimony, disagreeing on whether she had concluded that one or three of the four swabs taken contained male DNA matching Defendant's. Defense counsel stated that only one swab contained the DNA and then used baseball terms to argue that a .250 average was not very convincing. On rebuttal argument, the State contended that the defense would have to show a .000 chance and that by showing that three out of four swabs contained DNA, it was a .750 average. Defense counsel objected to that argument, asserting that it improperly shifted the burden of proof to Defendant, and the judge overruled the objection without input from the State. The trial court then gave the jury its instructions. On September 28, 2023, the jury found Defendant guilty of three of the four charges.

¶ 16 Defendant filed posttrial motions asking the trial court to reconsider its denial of his motions for a directed verdict, for JNOV, and for a new trial. The court heard argument on all the motions in January 2024. Defendant's arguments on the directed verdict and JNOV rulings were

largely the same, addressing the State's failure to prove a five-year age difference between him and the victim. Defendant argued that Christy, his mother-in-law, could not testify as to his age because she was not a "close relative." He made a similar argument about S.M., who was his sister-in-law at the time of trial. He further argued that the evidence was insufficient to prove his guilt and that the State's closing argument asserting that Defendant needed to show the DNA test swabs had a "batting average" of .000 improperly shifted the burden of proof because it meant Defendant was required to prove something.

¶ 17    The trial court disagreed, concluding that Defendant's mother-in-law could testify about his age because she was a close relative. The court also denied Defendant's motions for JNOV and for a new trial. It reserved ruling on Defendant's motion to reconsider the denial of his motion for a directed verdict until it received a transcript of Detective Schumacher's testimony. The court believed the transcript would show whether the detective had learned Defendant's age directly from conversations with him. After the trial court reviewed the transcript, it concluded that Schumacher did not testify to learning of Defendant's age from conversations with him. Nevertheless, the court denied Defendant's motion to reconsider the denial of his motion for directed verdict and, instead, reiterated its denial of the motions for new trial and JNOV.

¶ 18    Subsequently, the trial court sentenced Defendant to 48 months' probation as a sex offender. Defendant made a motion to reconsider his sentence, arguing that probation fees had been improperly set at $50 per month rather than $25 per month. The State asserted that, under the controlling statute, a fee of $50 per month shall be charged but that a limited fee of no more than $25 could be charged in the absence of a valid administrative order allowing the higher rate. 730 ILCS 5/5-6-3(i) (West 2024). Although no such order was provided, the trial court denied Defendant's motion to reconsider.

7

¶ 19       Defendant timely appealed the denials of his motions for directed verdict, JNOV, and a new trial, as well as the imposition of a $50 monthly probation fee.

¶ 20                                         II. ANALYSIS

¶ 21       A jury convicted Defendant on three counts of aggravated criminal sexual abuse. This crime can be committed several ways, but for our purposes it involves "an act of sexual penetration or sexual conduct with a victim who is at least 13 years of age but under 17 years of age and the person is at least 5 years older than the victim." 720 ILCS 5/11-1.60(d).

¶ 22       A conviction will not be overturned on appeal unless, when viewing all the evidence in the light most favorable to the prosecution, no reasonable trier of fact could have found that all the essential elements of the offense were proven beyond a reasonable doubt. *People v. Collins*, 106 Ill. 2d 237, 261 (1985). Defendant contends that (1) the State failed to prove Defendant's age; (2) the State failed to prove Defendant had sexual contact with S.M.; (3) the State improperly shifted the burden of proof; and (4) that the final sentencing order imposed excessive probation fees.

¶ 23                                   A. Defendant's Age

¶ 24       Defendant contends that the trial court improperly denied a motion for a directed verdict, a subsequent motion for JNOV, and a motion for a new trial, all on the basis that the State failed to adequately establish his age. When reviewing a ruling on a motion for a directed verdict, the test is "whether all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors the movant that no contrary verdict based on the evidence could ever stand." *Jones v. Pneumo Abex LLC*, 2019 IL 123895, ¶ 26. While the Code of Criminal Procedure does not expressly authorize a JNOV, courts treat a JNOV as being substantively identical to a directed verdict. *People v. Van Cleve*, 89 Ill. 2d 298, 303 (1982). We conclude that the trial judge properly denied these motions.

¶ 25 Courts have recognized various methods of establishing a defendant's age. For example, the State can introduce testimony from a police officer who learned a defendant's age from inquiries made during a conversation with that defendant. *See In re O.S.*, 2018 IL App (1st) 171765, ¶ 36; *In re S.M.*, 2015 IL App (3d) 140687, ¶ 16. Additionally, the State can introduce a certified birth record or offer the testimony of a close relative during a trial in order to establish the age of either an offender or a victim. *Id*. However, we have no reason to conclude there are not other viable alternatives; the basic requirement that underlies the case law is that the witness must be in a position to know.

¶ 26 During the State's case-in-chief, it called Defendant's mother-in-law, Christy. She testified without objection that she first came to know Defendant perhaps 15 years earlier, when he was dating Christy's cousin, Valerie. She stated that Valerie and Defendant were teenagers at that time. She further stated that her daughter Paige was born February 14, 1998, and that "Mario [is] a lot older."

¶ 27 S.M. testified that her sister Paige is 5 years older than S.M. She further stated that Defendant was 24 years old at the time of the incidents. Defendant's counsel objected on hearsay grounds, but that objection was overruled.

¶ 28 Joliet detective Patrick Schumacher testified multiple times that Defendant was 25. It appears that Defendant's counsel initially objected to the first age-related question, saying "it's hearsay, Judge, but I also have additional grounds." A side-bar conference was held. The trial court stated on the record that Defendant objected to Schumacher's age-related testimony on hearsay and discovery violation grounds and that those objections were overruled. Later in his testimony, Schumacher again testified Defendant was 25, and that testimony entailed no objection.

9

¶ 29    A circuit court may not enter a directed verdict if any evidence, together with the reasonable inferences to be drawn therefrom, shows a substantial factual dispute or if conflicting evidence or the credibility of the witnesses is decisive. *Harris v. Thompson*, 2012 IL 112525, ¶ 42. Even if we were to agree that S.M. and Schumacher's testimony constituted hearsay, we would conclude that Christy's testimony was sufficient to justify the trial court's denial of a directed finding. As Defendant's mother-in-law, she is sufficiently close to Defendant to know his age. Even though her testimony did not include an exact age for Defendant, she stated at the September 2023 trial that she had known Defendant for 15 years and met him when he was in high school. That is sufficient to establish that he was well over 5 years older than S.M., who was 14 years old at the time of the December 2017 incident. Likewise, Christy testified that Paige is 5 years older than S.M., and Chavez is "a lot older" than Paige.

¶ 30    Viewing the evidence as a whole, we conclude that the State provided enough properly admitted evidence that Defendant was at least five years older than the victim to survive Defendant's motion for a directed verdict.  We cannot say that the evidence of Defendant's age, "when viewed in its aspect most favorable to the opponent, so overwhelmingly favors the movant that no contrary verdict based on the evidence could ever stand." *Jones*, 2019 IL 123895, ¶ 26. Accordingly, we affirm the trial court's denial of Defendant's motion for directed verdict and his motion to reconsider that ruling.

¶ 31    For the same reasons, we conclude that the age-based motion for JNOV and new trial were properly denied. We also note that Paige testified as a defense witness and stated that Defendant's date of birth is January 13, 1992. That testimony was not considered in connection with the motion for directed finding because it came in Defendant's case-in-chief, but it certainly supports the jury's ultimate verdict in the case.

10

¶ 32                           B. Sexual Contact Between Defendant and S.M.

¶ 33        Defendant argues that the evidence of his guilt was insufficient to sustain a guilty verdict

beyond a reasonable doubt. In a criminal case, challenges to the sufficiency of the evidence, taken

as a whole, must be reviewed by considering the evidence in the light most favorable to the State,

and we are not required to conduct a point-by-point review of each piece of evidence or possible

inference asserted on appeal. *People v. Wheeler*, 226 Ill. 2d 92, 117 (2007). A criminal conviction

will be reversed only where the evidence is so unreasonable, improbable, or unsatisfactory that it

creates a reasonable doubt of the defendant's guilt. *Id.* at 115.

¶ 34        For example, Defendant points to Paige's testimony that Defendant and the victim were

never alone during the three days S.M. visited the couple. The determination of credibility,

however, is within the province of the jury. "The trier of fact is best equipped to judge the

credibility of witnesses, and due consideration must be given to the fact that it was the trial court

and jury that saw and heard the witnesses. [Citation.] Accordingly, a jury's findings concerning

credibility are entitled to great weight." *Id.* at 114–15. Here, Defendant points to nothing to

persuade us to take the drastic step of overturning the jury's credibility determinations.

¶ 35        Nor can it be said that the evidence of penetration and other sexual contact is unreasonable

or improbable in light of S.M.'s testimony and the supporting forensic evidence showing that

Defendant's DNA was present in her vagina. Looking at the evidence in the light most favorable

to the State, we conclude it was sufficient to satisfy the burden of proving Defendant's guilt beyond

a reasonable doubt. Accordingly, the trial court properly denied Defendant's motions on this issue.

¶ 36                                        C. Burden Shifting

11

¶ 37    Defendant next requests that this court grant him a new trial because the State's closing argument improperly shifted the burden of proof to him. On appeal, we review *de novo* whether a prosecutor's statements are so egregious that they warrant the imposition of a new trial. *Id*. at 121.

¶ 38    The State's comments cited by Defendant were prompted by an analogy initiated by his own defense counsel. Defense counsel offered an analogy between baseball batting averages and the percentage of swabs containing Defendant's DNA that were obtained during the victim's medical evaluation at the hospital. The lack of clarity in the DNA expert's explanation arguably created a dispute as to whether one or three of the vaginal swabs taken from the victim contained DNA comparable to that obtained from Defendant. In his closing argument, defense counsel attempted to minimize the importance of the comparison because, in his view, the expert said that only one of four swabs contained Defendant's DNA, representing a "batting average" of .250. In its response, the State asserted that the testimony indicated that three of the four swabs obtained from the victim contained Defendant's DNA, making the actual "batting average" .750. The State further explained that for Defendant's argument to meaningfully show that no sexual contact had occurred, the "batting average" would have to have been .000.

¶ 39    We must review challenged remarks in a party's closing argument in the proper context. *Id*. at 122. Here, Defendant's attorney started to use the batting average analogy, and the State responded in kind. "[A] prosecutor may respond to comments made by defense counsel that invite a response." *People v. Anaya,* 2017 IL App (1st) 150074, ¶ 85. The State's assertion that Defendant would need to argue an average of .000 to show the absence of any sexual contact is no different than saying he would have had to argue that his DNA was not present on any of the swabs obtained from the victim. The analogy did not impermissibly shift the burden of proof to Defendant; it merely articulated the best possible argument that Defendant could make and asserted that the facts

12

did not support that claim. Additionally, after Defendant objected to the State's assertion, the court admonished the jury that closing arguments are merely argument, not evidence. Because we conclude that the State's comments did not improperly shift the burden of proof to Defendant, we affirm the denial of Defendant's motion for a new trial.

¶ 40                                                    D. Probation Fees

¶ 41        As part of Defendant's sentence to 48 months' probation, the trial court assessed probation fees of $50 per month, which were calculated by dividing the $2,400 fee in the Financial Sentencing Order by the 48 months of probation to be served. Defendant challenges the calculation of that monthly fee, having previously filed a motion to reconsider his sentence that addressed only that issue. Questions regarding the propriety of fines, fees, and costs in a sentencing order are reviewed *de novo*. *People v. Ackerman*, 2014 IL App (3d) 120585, ¶ 26.

¶ 42        The relevant statute states, in pertinent part: "The court shall impose upon an offender sentenced to probation *** a fee of $50 for each month of probation. *** A circuit court may not impose a probation fee under this subsection (i) in excess of $25 per month unless the circuit court has adopted, by administrative order issued by the Chief Judge, a standard probation fee guide determining an offender's ability to pay." 730 ILCS 5/5-6-3(i) (West 2024). Neither party has cited any case law interpreting that statutory section.

¶ 43        Defendant claims that the proper fee here is $25 per month under the statute. At the hearing on his motion to reconsider the sentence, the State advised the trial court that it routinely requested a fee of $50 per month because it believed that the Chief Judge had previously issued the requisite administrative order.

¶ 44        The trial court set the total probation/supervision fee at $2,400. Nothing in the record shows that the State ever located or brought to the court's attention the requisite administrative order from

13

the Chief Judge, nor has either party provided that order to this court. Applying the plain language of the statute, a $50 per month fee "shall" be imposed if a standard fee guide is in place as an administrative order. Without that administrative order, a fee of only $25 per month may be assessed. Will County may indeed have such an administrative order, but it is not part of the record. Accordingly, we modify the judgment to reduce the probation fee to $25 per month.

¶ 45                                  III. CONCLUSION

¶ 46        For the reasons stated, we affirm the judgment of the Will County Circuit Court denying Defendant's motions for a directed verdict, judgment notwithstanding the verdict, and a new trial. We also modify the judgment assessing the monthly probation fee.

¶ 47        Affirmed as modified.